*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0318

MORGAN BANKS, *et al*., APPELLANTS,

V.

DAVID H. HOFFMAN, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2017-CA-005989-B)

(Hon. Hiram E. Puig-Lugo, Motions Judge)

(Argued April 20, 2022            Decided September 7, 2023)

*Bonny J. Forrest*, of the bars of the States of New York and California, *pro hac vice*, by special leave of the court, with whom *Kirk Jenkins* and *John B. Williams* were on the brief, for appellants L. Morgan Banks, III, Debra L. Dunivin, and Larry C. James.

*James C. McKay*, *Jr.*, Senior Assistant Attorney General, for appellee District of Columbia. *Karl A. Racine*, Attorney General for the District of Columbia at the time, *Loren L. AliKhan*, Solicitor General at the time, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time, *Carl J. Schifferle*, Deputy Solicitor General, and *Mark S. Wigley*, Assistant Attorney General, were on the brief for appellee District of Columbia.

*Barbara S. Wahl*, with whom *Randall A. Brater* and *Michael F. Dearington* were on the brief, for appellee American Psychological Association.

*Thomas G. Hentoff*, with whom *John K. Villa, Stephen J. Fuzesi, Krystal C. Durham* and *Matthew J. Greer* were on the brief, for appellees David H. Hoffman, Sidley Austin, LLP, and Sidley Austin (DC), LLP.

Before BLACKBURNE-RIGSBY, *Chief Judge*, HOWARD, *Associate Judge*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*:    This matter is an appeal from the Superior Court's dismissal of a defamation action pursuant to the special-motion-to-dismiss provisions of the District of Columbia Anti-SLAPP Act.[1]   In challenging the dismissal, plaintiffs/appellants argue inter alia that the D.C. Anti-SLAPP Act is invalid because its enactment violated the District of Columbia Home Rule Act (the "Home Rule Act").[2]   For the reasons set out below, we agree that the Home Rule Act, and in particular its preservation of Title 11 of the D.C. Code, precluded the Superior Court from giving effect to the discovery-limiting aspects of the D.C. Anti-SLAPP Act's special-motion-to-dismiss provisions.  Accordingly, we reverse the judgment of dismissal and remand for further proceedings consistent with this opinion.  In light of the discovery limitations the Superior Court implemented, we

---

[1] Formally, the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act (hereafter referred to as the "D.C. Anti-SLAPP Act," the "Anti-SLAPP Act," or the "Act"), D.C. Code §§ 16-5501–16-5505.

[2] District of Columbia Self Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973), codified at D.C. Code §§ 1-201.01-1-207.71.

also vacate the court's rulings on the "public official" and "republication" issues discussed below and remand as to those issues as well.

## I.     Introduction

### A. Procedural Background

Plaintiffs/appellants are Col. (Ret.) L. Morgan Banks, III, Col. (Ret.) Debra L. Dunivin, and Col. (Ret.) Larry C. James.  All three are retired military psychologists who were mentioned prominently in a report ("the Report"), published in 2015 on the American Psychological Association ("APA") website, concluding that certain APA officials colluded with the U.S. Department of Defense ("DoD") "to support the implementation by DoD of the interrogation techniques [directed at persons detained following the events of September 11, 2001] that DoD wanted to implement without substantial constraints from APA" ethical guidelines.  The Report identifies each of the appellants by name as a key participant in the alleged collusion.  Appellants filed the underlying action for defamation *per se*, defamation by implication, and false light invasion of privacy in 2017, naming as defendants the APA, which authorized and financed the Report; David H. Hoffman, the lead of a team of lawyers who conducted the underlying

investigation and prepared the Report; and the law firm in which Hoffman is a partner, Sidley Austin LLP, and its affiliated entity Sidley Austin (DC) LLP (together, "Sidley").[3]

The APA, Hoffman, and Sidley filed special motions to dismiss the lawsuit pursuant to the D.C. Anti-SLAPP Act. *See* D.C. Code § 16-5502(a). In response, appellants moved to declare the Anti-SLAPP Act void as in contravention of the Home Rule Act, and as unconstitutional under the First Amendment right to petition for redress of grievances. The District of Columbia intervened to defend the Anti-SLAPP Act legislation. In two separate orders, the Superior Court first denied appellants' motion to declare the Anti-SLAPP Act violative of the Home Rule Act and unconstitutional, and then granted appellees' special motions to dismiss, finding that appellants had failed to show that they were likely to succeed on the merits of their defamation and related claims.

Appellants now seek reversal of the Superior Court's orders on five grounds: (1) enactment of the D.C. Anti-SLAPP Act violated the Home Rule Act because it

---

[3] Originally, five plaintiffs filed suit, but two of them were referred to arbitration pursuant to their employment contracts with the APA. Those former plaintiffs are Dr. Stephen Behnke and Dr. Russell Newman.

is a legislative enactment with respect to Title 11 of the D.C. Code, which is beyond the authority the Home Rule Act conferred on the Council of the District of Columbia (the "Council"), and because the Act's special-motion-to-dismiss procedure squarely conflicts with the mandate Congress set out in section 946 of Title 11 (D.C. Code § 11-946); (2) the D.C. Anti-SLAPP Act is unconstitutional because it impairs exercise of the First Amendment right to petition for redress of grievances; (3) the Superior Court reached its determination that appellants were not likely to succeed on the merits of their claims by erroneously treating appellants as "public officials," who can prevail on a claim of defamation only by showing that the defendants acted with actual malice; (4) even if the actual-malice standard applies, appellants came forward with evidence sufficient to permit a reasonable jury to find, by clear and convincing evidence, that appellees acted with actual malice in publishing the statements in issue; and (5) the Superior Court erred in ruling that the APA did not "republish" the Report in August 2018.

## B. The D.C. Anti-SLAPP Act

The legislative history of the D.C. Anti-SLAPP Act describes a SLAPP — a strategic lawsuit against public participation — as an action "'filed by one side of a political or public policy debate aimed to punish or prevent the expression of

opposing points of view.'" *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (quoting Council of the District of Columbia, Report of Comm. on Pub. Safety and the Judiciary on Bill 18-893, at 1 (Nov. 18, 2010) (hereinafter, the "Report on Bill 18-893")).  In enacting the D.C. Anti-SLAPP Act in 2010, the Council joined nearly 40 other jurisdictions that had already adopted or were considering the adoption of anti-SLAPP legislation.  Report on Bill 18-893 at 3.  In the words of the Committee on Public Safety, the Act "incorporates substantive rights with regard to a defendant's ability to fend off" SLAPPs, so as to "allow a defendant to more expeditiously, and more equitably, disp[ose] of a SLAPP." *Id.* at 1, 3.

The Anti-SLAPP Act's provisions at issue in this case are codified at D.C. Code §§ 16-5502 and 16-5504(a).  Section 16-5502 provides that:

> (a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

> (c)

(1) Except as provided in paragraph (2) of this subsection, upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of.

(2) When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

(d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

D.C. Code § 16-5502(a)-(d).

Construing the "likely to succeed on the merits" standard of § 16-5502(b), this court has held that it is "substantively the same" as the summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure. *Mann*, 150 A.3d at 1238 n.32 (stating that the "likelihood of success standard . . . simply mirror[s] the standards imposed by Federal Rule 56" (internal quotation marks and citation omitted)).[4]  At the same time, "the special motion to dismiss is different from

---

[4] "[T]he standard to be employed by the court in evaluating whether a claim is likely to succeed may result in dismissal only if the court can conclude that the claimant could not prevail *as a matter of law*, that is, after allowing for the

[Rule 56] summary judgment in that it imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented before discovery is completed," *id.*, and because, under § 16-5502(c), "the decision to grant or deny targeted discovery rests within the trial court's broad discretion," *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 513 (D.C. 2020). In addition, the Anti-SLAPP Act's "reversal of the allocation of burdens for dismissal" relieves the special-motion-to-dismiss movant from "shoulder[ing] the initial burden of showing that there are no material facts genuinely in dispute and that the movant is entitled to judgment as a matter of law on the undisputed facts." *Mann*, 150 A.3d at 1237.

D.C. Code § 16-5504(a) provides in relevant part that "[t]he court may award a moving party who prevails, in whole or in part, on a motion brought under § 16-5502 . . . the costs of litigation, including reasonable attorney fees." Interpreting this provision, this court has recognized that "the Act imposes no requirement on a successful movant under § 16-5504(a) to show either . . . improper motive (bad faith) or total lack of merit in the underlying suit . . . before

---

weighing of evidence and permissible inferences by the jury." *Mann*, 150 A.3d at 1236 (emphasis in the original).

reasonable attorney's fees may be awarded." *Doe v. Burke*, 133 A.3d 569, 575 (D.C. 2016).

## C. Factual Background

In late 2004, the *New York Times* and other media outlets published articles about the abuse of detainees captured by the United States as part of its global war on terror. These articles, and the reports underlying them, directly implicated psychologists as assisting in the carrying out of abusive interrogations of detainees. Amidst growing public scrutiny, the APA — a professional organization of over 117,500 members across the United States — convened a task force, known as the Psychological Ethics and National Security Task Force (the "PENS Task Force" or the "Task Force") to "explore the ethical dimensions of psychology's involvement and the use of psychology in national security-related investigations." Appellants Banks and James were among the ten individuals selected to be on the Task Force, and they were two of the Task Force's three members who were military officers at the time. Appellant Dunivin, who was also a military officer at the time, was not a member of the Task Force, but she proposed members for it (and, according to the Report, influenced its composition).

The PENS Task Force met for three days in June 2005 and, at the conclusion of the meetings, issued a set of guidelines with commentary, known as the PENS Guidelines, "about the ethical obligations of the APA members" involved in national-security-related work. The PENS Guidelines stated that psychologists "may serve in various national security-related roles, such as a consultant to an interrogation," but that psychologists should "strive to ensure that they rely on methods that are effective, in addition to being safe, legal, and ethical." The APA Board adopted the PENS Guidelines as official policy in July 2005.

In the years that followed issuance of the PENS guidelines, the APA was publicly criticized for allowing psychologists to consult on national security interrogations. In 2014, nine years after the issuance of the PENS Guidelines, *New York Times* Reporter James Risen published a book entitled *Pay Any Price: Greed, Power and Endless War*, which charged that the APA had colluded with the U.S. government to support torture. In response, the APA commissioned Sidley to conduct "an independent review" to determine "whether APA officials [had] colluded with DoD, CIA, or other government officials to 'support torture.'" The review culminated in the 541-page Report, entitled "Independent Review Relating

to APA Ethics Guidelines, National Security Interrogations, and Torture."[5]  The APA published the Report on its website in July 2015.

Under a section of the Report entitled "Summary of the Investigation's Conclusions," the Report notes that its "principal findings relate to the 2005 [PENS] [T]ask [F]orce."  The first of the "principal findings" is that "key APA officials . . . colluded with important DoD officials to have APA issue loose, high-level ethical guidelines that did not constrain DoD in any greater fashion than existing DoD interrogation guidelines."[6]  The Report identified appellant Banks as "the key DoD official" with whom the APA partnered and appellant Dunivin as "the other DoD official who was significantly involved in the confidential coordination effort."  The Report states as its next "principal finding" that "in the three years following the adoption of the 2005 PENS Task Force report as APA policy, appellants and APA officials engaged in a pattern of secret collaboration with DoD officials to defeat efforts by the APA Council of Representatives to

---

[5]  A link to the report is contained on the APA website at https://www.apa.org/news/press/statements/interrogations; https://perma.cc/HRN5-PEN8.  According to Sidley's brief, the Report was based on the law firm's having "interviewed roughly 150 witnesses, conducted over fifty follow-up interviews of witnesses, and reviewed over 50,000 documents" over an eight-month period.

[6] The Complaint asserts that this statement is the Report's "most prominent false conclusion."

introduce and pass resolutions that would have definitively prohibited psychologists from participating in interrogations at Guantanamo Bay and other U.S. detention centers abroad." In an additional "principal finding," the Report states that "ethics complaints against prominent national security psychologists w[ere] handled in an improper fashion, in an attempt to protect these psychologists from censure." Appellant James is one of the psychologists who allegedly was "shielded" from censure.

## D. The Particulars of the Complaint and the Superior Court's Rulings

Appellants' August 2017 Complaint and February 2019 Supplemental Complaint allege that the Report had "an overarching false and defamatory narrative: [that] from 2005 to 2014, [p]laintiffs and others 'colluded' to block the APA from taking any effective steps to prevent psychologists' involvement in abusive interrogations."[7] The complaint alleges that each of the Report's "three primary conclusions . . . is false" and that the Report damaged appellants' reputations and careers. As to Mr. Hoffman and Sidley, appellants assert that these appellees made defamatory statements in the Report that they knew were false or

---

[7] Hereafter, references to the "complaint" are to the Supplemental Complaint unless otherwise indicated.

with reckless disregard for their truth or falsity; purposely avoided information that they knew would contradict their preconceived narrative; relied on sources they knew were biased or unreliable; failed to adhere to proper investigative practices; and refused to correct or retract defamatory statements despite receiving additional evidence of their falsity. As to the APA, appellants assert that the APA Board hastily reviewed the Report and published it despite knowledge of its errors. The complaint alleges in addition that an APA email referencing the Report and changes made to the APA's website in August 2018 constituted a republication of the Report. An Exhibit to the complaint identifies 219 (allegedly) defamatory statements made in the Report.[8]

---

[8] Appellees argued in their special motions to dismiss that appellants' allegations did not "come close to establishing" that the Report contained statements that appellees knew were false or about whose truth they entertained doubts, and further that the allegations of the complaint were insufficient to establish actual malice. Mr. Hoffman and Sidley asserted in addition that they believe the Report's interpretation of the events it discusses is correct. The APA asserted that it was entitled to rely on the statements in the Report and had no obligation to investigate the Report before releasing it to the public. In their briefs in this appeal, appellees argue that appellants cannot show, by clear and convincing evidence, that appellees published false statements about them with actual malice. The Sidley brief argues in addition that appellants "rely on inaccurate and generalized second-hand characterizations of [the] Report or their own paraphrasing," thereby complaining about alleged statements that the Report "never said."

In a January 23, 2020, order, the Superior Court rejected appellants' argument that the Anti-SLAPP Act is invalid, and the court granted appellees' special motions to dismiss in a March 12, 2020, order.  In the latter order, the Superior Court determined that appellees had made a prima facie showing that appellants' claims "ar[ose] from an act in furtherance of the right of advocacy on issues of public interest" within the meaning of the Anti-SLAPP Act (a determination that appellants do not challenge in this appeal) and thus that, under § 16-5502(b), the burden shifted to appellants to show that they were likely to succeed on the merits.  The court determined that each appellant is a "public official" for purposes of defamation law and therefore could prevail only by presenting evidence that would permit a jury to find by clear and convincing evidence that appellees acted with actual malice, i.e., with knowledge that the statements in dispute were false or with reckless disregard of whether they were false.  The court then found that appellants had failed to make the requisite showing despite having had the opportunity to conduct some targeted discovery pursuant to § 16-5502(c)(2).[9]  The court also determined as a matter of law that

_____

[9] The court reasoned, for example, that affidavits appellants submitted in support of their opposition to the special motions to dismiss did not support a finding of actual malice because, notwithstanding the affiants' impression that Sidley had a "preconceived narrative" at the time Sidley investigators interviewed the affiants, the affiants' statements shed no light on "where along the investigative process . . . [the] interviews [of the affiants] took place, and what information

APA did not republish the Report in August 2018. This appeal followed. Appellants seek a remand for full discovery and trial.

## II. Analysis

### A. The Validity of the Anti-SLAPP Act's Provisions

### 1. Whether the Anti-SLAPP Act's Special-Motion-to-Dismiss Procedure Contravenes the Home Rule Act

We turn first to appellants' contention that the D.C. Anti-SLAPP Act is void under the Home Rule Act. We note that the issue of the validity of the D.C. Anti-SLAPP Act in light of D.C. Code § 11-946 was before this court earlier in *Khan v. Orbis Business Intelligence Ltd.*, 292 A.3d 244 (D.C. 2023), but the issue had not been raised in the trial court, and we therefore declined to address it on appeal. *See id.* at 260. In the instant case, the issue of whether the Act's special-motion-to-dismiss procedure contravenes the Home Rule Act has been preserved and timely raised, and so we address it as a matter of first impression.

---

investigators had received prior to the interviews leading them to focus their inquiry."

Appellants' claim is based on the Home Rule Act provision that states, in relevant part, that "[t]he Council shall have no authority to . . . [e]nact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia Courts)." D.C. Code § 1-206.02(a)(4).[10] Title 11 was enacted by Congress in 1970 as part of the so-called Court Reorganization Act.[11] It "address[es] a wide range of topics,"[12] and specifies, among other things, that "[t]he Superior Court shall conduct its business

---

[10] Section 1-206.02(a)(4) (formerly codified as § 1-147(a)(4), *see Coleman v. District of Columbia*, 80 A.3d 1028, 1035 n.9 (D.C. 2013)) is one of several provisions of Title VI of the Home Rule Act ("Reservation of Congressional Authority") through which Congress explicitly reserved legislative authority in certain areas. Section 602 of the Home Rule Act, codified as D.C. Code § 1-206.02, is titled "Limitations on the Council." 87 Stat. at 813.

[11] This is a shorthand reference to the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 473. In enacting the Home Rule Act, Congress mandated that the District of Columbia court system "shall continue as provided under the . . . Court Reorganization Act," "subject to . . . [D.C. Code] § 1-206.02(a)(4)." D.C. Code § 1-207.18(a); *see also Parker v. K&L Gates, LLP*, 76 A.3d 859, 880 (D.C. 2013) (McLeese, J., concurring) (noting that in enacting the Court Reorganization Act, Congress "likely intended" to "maintain[] uniformity between the law of this jurisdiction and federal law"). As one commentator has observed, "there was no question that the Court Reorganization Act was not promoted by its sponsors as a home rule measure . . . ." Steven M. Schneebaum, *The Legal and Constitutional Foundations for the District of Columbia Judicial Branch*, 11 UDC/DCSL L. Rᴇᴠ. 13, 17 (2008) (quoted in *Johnson v. District of Columbia*, 584 F. Supp. 2d 83, 88 (D.D.C. 2008)).

[12] *Woodroof v. Cunningham*, 147 A.3d 777, 783 (D.C. 2016).

according to the Federal Rules of Civil Procedure . . . unless it prescribes or adopts rules which modify those Rules." D.C. Code § 11-946. It instructs that any such Superior-Court-adopted rules "shall be submitted for the approval of the District of Columbia Court of Appeals, and they shall not take effect until approved by that court." *Id.*

Appellants argue that the Anti-SLAPP Act violates the Home Rule Act because it is legislation "with respect to [a] provision of Title 11," which in particular "intrudes . . . on [Title 11, § 946] by imposing rules on the Superior Court that modify the Federal Rules but have not been approved by the D.C. Court of Appeals." Appellants assert that the intrusion entails "erecting an entirely separate procedural mechanism" that "blocks most if not all discovery," that "requires a court to consider the legal sufficiency of the evidence presented before discovery," and that "permits a quick dismissal unavailable under the [Federal Rules of Civil Procedure ("FRCP")]."[13]

---

[13] Appellants also assert that the Act potentially and impermissibly "shifts the burden of defendants' attorneys' fees to plaintiffs." However, this court has already ruled that the D.C. Anti-SLAPP Act provision authorizing that attorney-fee-shifting does not violate the Home Rule Act because neither the Federal Rules of Civil Procedure nor any provision of Title 11 dictates that parties are to bear their own attorney's fees. *See Khan*, 292 A.3d at 260-61.

The District of Columbia argues that the Home Rule Act limitation on the Council's authority set out in § 1-206.02(a)(4) — again, the proscription against the Council's enacting "any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia Courts)" — pertains only to the Council's ability to pass laws "that run directly contrary to the 'organization' or 'jurisdiction' of [District of Columbia] courts" and does not pertain to "rules of procedure."[14] And, the District asserts, even if the limitation on the Council's authority does apply to court rules of procedure, the limitation does not render the D.C. Anti-SLAPP Act void because the Act creates "substantive" rights, and its special-motion-to-dismiss provisions are "substantive law" that "does not impermissibly conflict with Title 11 or the Superior Court's procedural rules [that are analogues of the FRCP]." The District emphasizes this court's statements that the Act was intended by the Council to extend "substantive rights" to SLAPP defendants, *Doe*, 133 A.3d at 575-76, and that the "Act's purpose [was] to create a *substantive* right not to stand trial and to avoid the burdens and costs of pre-trial procedures" when defendants face legally insufficient claims that arise from protected activity, *Mann*, 150 A.3d at 1231 (emphasis added); *see also Fridman,* 229 A.3d at 502 (citing the explanation in the Report on Bill 18-893 that the Act's purpose was "[t]o mitigate 'the amount of

---

[14] Appellants' March 8, 2022, motion to strike the District's brief is denied.

money, time, and legal resources' that defendants named in [SLAPP] lawsuits must expend" by "creat[ing] substantive rights which accelerate the often lengthy processes of civil litigation").

The foregoing statements about the Council's intent notwithstanding, our case law forecloses the notion that the Act's special-motion-to-dismiss provisions are not rules of procedure. We have observed that the Act's special motion to dismiss is in essence an expedited summary judgment motion, "albeit with procedural differences." *Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 740-41 (D.C. 2021).[15] We have further acknowledged that the Act "creates a distinct *procedural* tool to be used to combat certain lawsuits," *Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 609 (D.C. 2020) (emphasis added), and provides SLAPP defendants "with procedural tools to protect themselves from 'meritless' litigation," *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 142 (D.C. 2021). Of particular note is the Act's provision (in § 16-5502(c)(1)) that "discovery proceedings . . . shall be stayed" upon the filing of a special motion to dismiss.

---

[15] *See also Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015) (observing that "rules governing motions for summary judgment are procedural" (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 404 (2010))).

[16] *Woodroof*, 147 A.3d at 783.

That discovery-limiting provision, like other "rules governing pretrial discovery," is a rule "'addressed to procedure.'" *Passmore v. Baylor Health Care Sys.,* 823 F.3d 292, 299 (5th Cir. 2016) (quoting *Shady Grove*, 559 U.S. at 404 (making that observation about both "rules governing summary judgment" and rules governing "pretrial discovery")). That the D.C. Anti-SLAPP Act's discovery-limiting provisions were intended to provide substantive protections does not diminish their procedural nature because "most procedural rules do" "affect[] a litigant's substantive rights." *Shady Grove*, 559 U.S. at 407.

As to the District's argument that the parenthetical in § 1-206.02(a)(4) signifies that this Home Rule Act limitation on the Council's authority precludes only Council action affecting the *organization* or *jurisdiction* of the D.C. Courts, we reject the argument for a number of reasons. First, the phrase in the parenthetical — "organization and jurisdiction of the District of Columbia Courts" — merely repeats the title of Title 11, which is "Organization and Jurisdiction of the Courts," and is not reasonably read as specifying that only a subset of the "wide range of topics"[16] covered by Title 11 is off-the-table for Council action.[17]

---

[16] *Woodroof*, 147 A.3d at 783.

[17] *See, e.g.*, *Oppedisano v. Holder*, 769 F.3d 147, 150 (2d Cir. 2014) (explaining that "relating to" parentheticals are an "aid to identification only" and "alert readers to the nature of the otherwise anonymous section numbers"); *United States v. Abdur-Rahman*, 708 F.3d 98, 100 (2d Cir. 2013) (reasoning that the

In addition, § 1-206.02(a)(4) states that "[t]he Council shall have no authority to . . . [e]nact any act, resolution, or rule with respect to *any provision* of Title 11" (italics added), denoting that the limitation on the Council's authority reaches beyond provisions that establish the organization and jurisdiction of the D.C. Courts.[18]   By its plain meaning, this language precludes Council action that contravenes the Title 11 procedural provision designated as § 11-946, which, again, mandates that the Superior Court is to conduct its business according to the

parenthetical "(relating to mail, bank, and wire fraud)" "serves only an explanatory or descriptive purpose and does not expressly limit the definition of felony violation to only those offenses identified in the parenthetical"); *United States v. Harrell*, 637 F.3d 1008, 1012 (9th Cir. 2011) (parentheticals aid a section's identification rather than limiting its application); *Garrido-Morato v. Gonzales*, 485 F.3d 319, 322 n.1 (5th Cir. 2007) ("[P]arenthetical 'related to alien smuggling' . . . is descriptive and not limiting."); *Mapp v. District of Columbia*, 993 F. Supp. 2d 26, 29 (D.D.C. 2014) ("'[R]elating to' parentheticals are 'descriptive and not limiting.'" (quoting *Garrido-Morato*, 485 F.3d at 322 n.1)).

[18] In looking to the plain meaning of § 1-206.02(a)(4), we are adhering to the principle that "[i]n endeavoring to discern the meaning of any particular statute, '[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he or she used.'"  *Thomas v. United States*, 171 A.3d 151, 153 (D.C. 2017) (quoting *Clark Constr. Grp., Inc. v. D.C. Dep't of Emp. Servs.*, 123 A.3d 199, 202-03 (D.C. 2015)).

The District implies that the Anti-SLAPP Act does not contravene the Home Rule Act because it does not amend Title 11 itself, but the Act's discovery-limiting provisions do just that:  they effectively amend and modify § 11-946 to mandate that the Superior Court "shall conduct its business according to the Federal Rules of Civil Procedure . . . *except upon the filing of an Anti-SLAPP Act special motion to dismiss or* unless it prescribes or adopts rules which modify those Rules . . . ."

Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure unless the Superior Court "prescribes or adopts rules which modify those Rules." D.C. Code § 11-946.[19]

Further, it cannot reasonably be thought inadvertent that the limitation on the Council's authority extends to every provision of Title 11. As we described in *Woodroof*, "a draft version of the [Home Rule] statute permitted the Council to 'pass acts affecting *all aspects* of [the District of Columbia] courts' after an 'eighteen-month period following . . . the date of enactment of [the Home Rule] Act.'" *Woodroof*, 147 A.3d at 783 (emphasis and second alteration supplied in *Woodroof*) (quoting H. Comm. on the District of Columbia, 93d Cong., 2d Sess., Home Rule for the District of Columbia 942 (Comm. Print 1974) ("Home Rule Print")). But the proposal raised concerns among the bench and bar that the legislation could "completely alter" the District's new court system, which had only recently been established through the 1970 Court Reorganization Act, before

---

[19] This was the concern registered preliminarily by then Attorney-General for the District of Columbia Peter J. Nickles in his September 17, 2010, letter to the then-Chair of the Council Committee on Public Safety & the Judiciary. Attorney General Nickles warned that the proposed Anti-SLAPP Act's special-motion-to-dismiss procedure "may run afoul of section 602(a)(4) of the Home Rule Act [§ 1-206.02(a)(4)]," which, he observed, "preserves the D.C. Courts' authority to adopt rules of procedure free from interference by the Council." Report on Bill 18-893 at 23.

it had time to mature and gain experience and also could threaten the independence of the judiciary. *See id.*; *Hessey v. Burden*, 584 A.2d 1, 7 (D.C. 1990). And of particular note, the judiciary expressed the concern that it was "unclear whether and the extent to which provisions [of the Court Reorganization Act] relating to . . . [the courts'] authority to adopt court rules . . . would survive the enactment of [the draft Home Rule legislation, H.R. 9056]." Home Rule Print at 1422.

Congress went on to reject H.R. 9056 as well as a "proposed amendment," *id.*, that would have provided that "[e]*xcept as otherwise provided in this Act*, the organization and jurisdiction of the District of Columbia courts shall be governed by [T]itle 11." *Id.* at 1423-24 (italics added). Congress determined to "*freez[e]* . . . *current law*," *id.* at 1425, mandating that the District of Columbia court system "shall continue as provided under the . . . Court Reorganization Act," "subject to . . . [D.C. Code] § 1-206.02(a)(4)." D.C. Code § 1-207.18(a). Thus, the language of § 1-206.02(a)(4) was specifically intended to continue in effect all of the provisions adopted through the Court Reorganization Act. *See id.*; *Woodroof*, 147 A.3d at 783; *see also Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61, 64 (D.C. 1980) ("The legislative history of § 11-946 reflects the congressional intent that the local courts were to be governed by the *federal* rules . . . ."); Home Rule Print at 1098 (transcript of Mark-up by Full Committee of H.R. 9056 (July 24,

1973)) (explaining that amendments to the proposed Home Rule legislation provided that "Title 11 of the District of Columbia Code shall remain in effect, that it shall be, not subject to change by the Council, and it shall not be a Charter change; and in effect, leaves the jurisdiction to this [congressional] Committee of how Title 11 may be changed in the future").

It is true, as the District reminds us, that this court has repeatedly said that our interpretation of § 1-206.02(a)(4) must not "thwart the paramount purpose of the [Home Rule Act], namely, to grant the inhabitants of the District of Columbia powers of local self-government." *Woodroof*, 147 A.3d at 784 (quoting *Andrew v. Am. Import Ctr.*, 110 A.3d 626, 629 (D.C. 2015)); *see also Bergman v. District of Columbia*, 986 A.2d 1208, 1226 (D.C. 2010) (noting that this court has "consistently held . . . that restrictions on the legislative authority of the Council in § 1-206.02(a)(4) must be narrowly construed, so as not to thwart th[at] paramount purpose" of the Home Rule Act).[20] We have emphasized that "[t]he literal wording of the statute is a primary index but not the sole index to legislative

---

[20] *See also id.* at 1225-26 (rejecting the argument that the Title 11 provision stating that this court "shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and exclusion" conferred upon this court "the *exclusive* authority to take any action which would restrict in any way the conduct of attorneys in the practice of law") (emphasis in the original).

intent" and "cannot prevail over strong contrary indications in the legislative history or so as to command an absurd result." *Citizens Ass'n of Georgetown v. Zoning Comm'n of D.C.*, 392 A.2d 1027, 1033 (D.C. 1978) (quoting *Lange v. United States*, 443 F.2d 720, 722-23 (D.C. Cir. 1971)). We therefore "have not construed D.C. Code § 1-206.02(a)(4) as rigidly as its language might permit." *Woodroof*, 147 A.3d at 785. Instead, "[w]hen the Council's actions do not *run directly contrary* to the terms of Title 11, . . . our past decisions have chosen not to interpret [the language of § 1-206.02(a)(4)] rigidly, but rather to construe this limitation on the Council's power in a flexible, practical manner." *Id.* at 784 (brackets and emphasis added).

The District argues that in employing that flexibility, this court has "construed [s]ection 1-206.02(a)(4) to prohibit the Council only from passing laws that directly conflict with or amend the jurisdiction or structure of the District's courts." What the District's argument reflects is that the vast majority of this court's previous decisions involving § 1-206.02(a)(4) have considered challenges to Council actions that arguably expanded or contracted this court's appellate jurisdiction as described in § 721 or § 722 of Title 11 (D.C. Code §§ 11-721, 11-722). We have not previously had occasion to consider a challenge premised on a claim that Council legislation is violative of the Home Rule Act because what the

legislation requires conflicts with the mandate of § 946 of Title 11 (D.C. Code § 11-946). Our previous decisions neither compel nor persuade us to reject appellants' Home Rule Act claim.

Moreover, we are not presented here with a possibility, similar to ones we have been presented with in some of our earlier cases, of adopting a broad or fluid interpretation of a term or phrase used in Title 11 or in the Home Rule Act in a way that enables us to give deference to the Council's intent. *Cf. Woodroof*, 147 A.3d at 780, 785, 787 (holding that a provision of the Revised Uniform Arbitration Act allowing immediate appeal to this court of an order granting a motion to compel arbitration did not violate § 1-206.02(a)(4)'s restriction on the Council's authority to enact legislation "with respect to" the jurisdiction of the courts; reasoning that § 11-721(a), which gives this court jurisdiction over "appeals from . . . all final orders and judgments," contains "no statutory definition of a 'final order,'" and that "categorizing orders as 'final' or 'interlocutory' can be a fluid concept"); *see also, e.g.*, *Price v. D.C. Bd. of Ethics & Gov't Accountability*, 212 A.3d 841, 845 (D.C. 2019) (upholding Council-enacted law that vested the Superior Court rather than this court with initial-review jurisdiction over Board of Ethics decisions on the ground that the Home Rule Act established this court's primary jurisdiction as extending to review of agency orders and decisions, "but

only 'to the extent provided by law,'" D.C. Code § 1-204.31(a) (quoting *District of Columbia v. Sullivan*, 436 A.2d 364, 368 (D.C. 1981))).  Neither the parties nor we have identified any "fluid" language in § 11-946 or in the Home Rule Act, or any narrow construction of the § 1-206.02(a)(4) restriction on the Council's legislative authority, that enables us to harmonize the conflict (described more fully in the paragraphs that follow) between the discovery-limiting aspects of the Anti-SLAPP Act's special-motion-to-dismiss procedure and Title 11 § 946 (which mandates adherence to the Federal Rules of Civil Procedure, absent modifications adopted through Superior Court rulemaking).

To be sure, we have said that Council legislation that has a mere "incidental" impact on the Superior Court's exercise of its jurisdiction under Title 11 does not contravene the Home Rule Act § 1-206.02(a)(4) limitation on the Council's authority to enact legislation with respect to any provision of Title 11. For example, we agreed in *Coleman* that "[a]lthough the foreclosure of a cause of action can certainly be said to affect the jurisdiction of the courts in a sense," such "incidental byproduct[s]" of changes in the substantive law "do[] not amount to an alteration of . . . jurisdiction" in violation of the Home Rule Act."  80 A.3d at 1035 n.9 (internal quotation marks and brackets omitted) (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 189-90 (D.C. Cir. 1986); *see also Umana v. Swidler &*

*Berlin, Chartered,* 669 A.2d 717, 724 n.15 (D.C. 1995) (explaining that the provision now codified as § 1-206.02 (a)(4) "does not . . . limit the Council's authority to enact or to alter the substantive law to be applied by the courts"). We have also upheld Council legislation that had an impact on the Superior Court's exercise of its jurisdiction under Title 11 where a separate provision of the Home Rule Act specifically gave the Council authority to "classify an act as a crime, or to decriminalize certain behavior." *Sullivan*, 436 A.2d at 366 (pertaining to legislation that decriminalized certain traffic offenses, thereby eliminating the Superior Court's original jurisdiction over those offenses). In the instant case, by contrast, we discern no such bases for a narrow construction of 1-206.02(a)(4)'s limitation on the Council's legislative authority. The Anti-SLAPP Act's discovery-limiting provisions are not a mere incidental byproduct of changes in the substantive tort law to be applied by the courts, and they do not have a mere "incidental" impact on the Superior Court's application of its counterparts to the federal rules of procedure governing pre-trial disposition of cases. Rather, the discovery-limiting provisions are a frontal and intentional feature of the Act and the main procedural tool to achieve the expedited and less costly disposition the Council had in mind. And while the District is correct that the Council has "broad authority to legislate," *Andrew*, 110 A.3d at 628 (citing D.C. Code § 1-203.02), the Council cannot curtail the pre-trial civil discovery provided for in the Federal

Rules of Civil Procedure "without running headlong into [one of the] limitation[s]" of § 1-206.02(a).  *In re Crawley*, 978 A.2d 608, 618 (D.C. 2009).

We think it important to note that recognizing the § 11-946 limitation on the Council's authority to legislate with respect to Superior Court procedure does not thwart the Home Rule Act's purpose of granting powers of local self-government, because § 11-946 already specifically prescribes how the *local* judiciary is empowered to modify court rules in a manner that departs from the Federal Rules of Civil and Criminal Procedure.   To repeat, § 11-946 states that the Superior Court is to conduct its business according to the FRCP "unless it prescribes or adopts rules which modify those Rules" by submitting them for approval of this court, and further that the Superior Court "may adopt and enforce other rules as it may deem necessary without the approval of [this court] if such rules do not modify the Federal Rules."[21]   D.C. Code § 11-946.  This distinguishes § 11-946

---

[21] Unlike Council legislation, the Superior Court's modification to the Federal Rules for use in Superior Court and this court's approval of such modifications are not subject to a congressional-review waiting period or congressional veto.

from other provisions of Title 11 wherein Congress made no allowance for how the requirements could be modified without congressional action.[22]

In any event, as we said in *Woodroof*, it is only "[w]hen the Council's actions do not run directly contrary to the terms of Title 11" that we have construed section Title 11 in a flexible manner. 147 A.3d at 784. That is not the situation here. As we elaborate below, the Act's discovery-limiting special-motion-to-dismiss procedure *is* directly contrary to § 11-946's prescription that the Superior

---

[22] Also noteworthy is that the D.C. Courts have utilized their authority under § 11-946 to amend the rules to accommodate or accomplish the intent of Council legislation. In 2021 and 2022, the Council enacted amendments to the debt collection statute, D.C. Code § 28-3814, to provide inter alia that "[i]n a cause of action initiated by a debt collector to collect a consumer debt, the debt collector shall attach to the complaint or statement of claim a copy of the signed contract, signed application, or other documents that provide evidence of the consumer's liability and the terms thereof, and shall allege or state [specified] information in the complaint or statement of claim." In April 2022, the Superior Court adopted, after this court's approval, an amendment to Rule 56, entitled "Consumer Debt Collection Actions," providing that "[i]n an action initiated by a debt collector to collect a consumer debt as defined in D.C. Code § 28-3814, the plaintiff must provide all documentation and information required by D.C. Code § 28-3814 prior to entry of summary judgment." Super. Ct. Civ. R. 56(a)(2); *see* Promulgation Order 22-06 (D.C. Super. Ct. 2022). At least arguably, this rule amendment averted a conflict between § 28-3814 and Super. Ct. Civ. R. 8(a), which "mirrors" FRCP 8(a) in requiring a pleading to contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543 (D.C. 2011). The courts have made no such rule amendment to accommodate the discovery-limiting aspects of the Anti-SLAPP Act's special-motion-to-dismiss procedure.

Court is to conduct its business according to the FRCP "unless it prescribes or adopts rules which modify those Rules" by submitting them for approval of this court. The Act thus runs up against "a limitation expressed by title 11 itself." *Hessey*, 584 A.2d at 7.[23]

Federal Rule of Civil Procedure 56 (like its Superior Court analogue) provides that

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d); *see also* Super. Ct. Civ. R. 56(d)(2). As the United States Court of Appeals for the Ninth Circuit has observed, while Rule 56 "facially gives judges the discretion to disallow discovery when the non-moving party cannot yet

---

[23] This conflict with a limitation expressed in Title 11 makes the issue in this case analogous to the one we considered in *Capitol Hill Restoration Society, Inc. v. Moore*, 410 A.2d 184, 186-88 (D.C. 1979) (explaining that Title 11 would preclude the Council from expanding this court's jurisdiction to include direct review of a determination by the District's State Historic Preservation Officer, because D.C. Code § 11-722 limits this court's authority to conduct direct reviews of agency action to review "in accordance with the . . . Administrative Procedure Act," which "in turn limits our review to 'contested cases'").

submit evidence supporting its opposition, the Supreme Court has restated the rule as *requiring*, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).

As noted above, this court recognized in *Mann* that the D.C. Anti-SLAPP Act special-motion-to-dismiss provision effectively functions as a Rule 56 motion for summary judgment. *Mann*, 150 A.3d at 1238 n.32. But unlike FRCP 56, the Act's special-motion-to-dismiss provision mandates generally that "upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of." D.C. Code § 16-5502(c)(1). That general rule is subject to the exception that "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted." *Id.* § 16-5502(c)(2). Under this provision, "discovery normally will not be allowed," as a plaintiff must show "more than 'good cause'" for discovery, such that it is "difficult" for a plaintiff to meet the § 16-5502 discovery standard. *Fridman*, 229 A.3d at 512. And, to refer again to our observation in *Mann*, "the special motion to dismiss is different from [Rule 56] summary judgment in that it

imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented *before discovery is completed*." 150 A.3d at 1238 n.32 (emphasis added).

In short, because of the discovery-limiting aspects of § 16-5502(c), the Act does not simply mirror Federal Rule of Civil Procedure 56. For that reason, the D.C. Circuit "stated [in its 2015 decision in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328,] that the special motion to dismiss created by D.C. Code § 16-5502 does not apply in federal court because it answers the same question as the Federal Rules of Civil Procedure — when a court must dismiss a case before trial — in a different way." *Id.* (citing *Abbas*, 783 F.3d at 1336); *see also Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 238-39 (D.C. Cir. 2021) (continuing to apply *Abbas* after this court's decision in *Mann*, explaining that under Federal Rule 56, "full discovery is the norm, not the exception," such that "summary judgment is typically premature unless all parties have had a full opportunity to conduct discovery," while under the D.C. Anti-SLAPP Act, "discovery normally will not be allowed" (internal quotation marks omitted)); *id.* ("Although *Mann* may undermine some of *Abbas*'s reasoning, the bottom line remains: the federal rules and the anti-SLAPP law answer the same question about the circumstances under which a court must dismiss a case before trial . . . differently, and the anti-SLAPP

law still conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial." (internal quotation marks omitted)); *Abbas*, 783 F.3d at 1334, 1335, 1336 (noting that the D.C. Anti-SLAPP Act establishes a procedural mechanism that "differs from" the Federal Rules and "disrupt[s] the comprehensive scheme embodied in the Federal Rules" (quoting *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 275 (9th Cir. 2013) (Kozinski, C.J., concurring))).

Most of the other federal courts of appeals that have ruled on the issue have similarly held that State anti-SLAPP statutes will not be applied fully (if at all) in the federal courts in their circuits because of the conflict between those anti-SLAPP statutes' procedural mechanisms and the Federal Rules of Civil Procedure.[24]    *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010), is a notable

---

[24] *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020) (rejecting the argument that the California anti-SLAPP statute "supplements rather than conflicts with the Federal Rules" and holding that "federal courts must apply Rules 12 and 56 instead of California's special motion to strike") (internal quotation marks omitted); *Klocke v. Watson*, 936 F.3d 240, 246 (5th Cir. 2019) (holding that the Texas anti-SLAPP statute conflicts with the federal rules because it "operates largely without pre-decisional discovery"); *Carbone v. CNN, Inc.*, 910 F.3d 1345, 1353-54 (11th Cir. 2018) (holding that the Georgia anti-SLAPP statute "abrogates the entitlements conferred" by the federal rules by requiring the plaintiff to rely exclusively on evidence he was able to obtain without discovery); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018) (reviewing California's anti-SLAPP statute and reasoning that

exception, but in that case the First Circuit applied the Maine anti-SLAPP statute in a diversity action on the rationale that "[i]f a federal court would allow discovery under Fed. R. Civ. P. 56(d) then, in our view, that would constitute

"[r]equiring a presentation of evidence without accompanying discovery would improperly transform the motion to strike under the anti-SLAPP law into a motion for summary judgment without providing any of the procedural safeguards that have been firmly established by the Federal Rules of Civil Procedure," a result the court "could not properly allow" because it "would effectively allow the state anti-SLAPP rules to usurp the federal rules."); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659, 661 (10th Cir. 2018) (affirming district court holding that the New Mexico anti-SLAPP statute's procedural mechanisms are inapplicable in federal court); *Metabolife*, 264 F.3d at 845, 846 (holding that the "discovery-limiting aspects" of California's anti-SLAPP statute "directly collide" with the "discovery-allowing aspects" of FRCP 56); *Z.F. v. Ripon Unified Sch. Dist.*, 482 F. App'x 239, 240 (9th Cir. 2012) (holding that if an anti-SLAPP motion to dismiss is based on a factual challenge rather than a purely legal challenge, it must be treated as a motion for summary judgment and "discovery must be permitted"); *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1042, 1048 (N.D. Ill. 2013) (observing that "it is clear from the Advisory Committee Notes . . . that Rules 12 and 56 *were* intended to provide the exclusive means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint," and concluding that the Washington anti-SLAPP statute could not be applied by a federal court sitting in diversity because it "plac[ed] a higher procedural burden on the plaintiff than is required to survive a motion for summary judgment under [federal] Rule 56), *aff'd*, 791 F.3d 729 (7th Cir. 2015). *But see*, *e.g.*, *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 182 (5th Cir. 2009) (applying Louisiana's anti-SLAPP statute in case where the plaintiff "fail[ed] to request" discovery). The Fifth Circuit panel in *Klocke* concluded that *Henry*'s conclusion about the applicability of the Louisiana anti-SLAPP statute was not binding because the opinion there gave "no indication . . . that the court considered the potential overlap or conflict between the Louisiana anti-SLAPP provision and the Federal Rules" and because "the *Henry* panel did not have the benefit of the Supreme Court's compelling decision in *Shady Grove*." *Klocke*, 936 F.3d at 248-49.

good cause [to allow discovery] under the Maine statute," *id.* at 91,[25] and on the additional rationale that the Maine anti-SLAPP statute "provides substantive legal defenses to defendants and alters what plaintiffs must prove to prevail," neither of which is the "province of . . . Rule 56," *id.* at 89 (noting that the Maine anti-SLAPP statute "substantively alters the type of harm actionable" by requiring the plaintiff to "show the defendant's conduct resulted in actual injury to the plaintiff" and further requires the plaintiff "to demonstrate that the defendant's activity (1) was without reasonable factual support, and (2) was without an arguable basis in law" (quoting Me. Rev. Stat. tit. 14, § 556 (internal quotation marks omitted))). The D.C. Anti-SLAPP Act is quite different from the Maine statute as that statute has been interpreted by the First Circuit: as discussed above, under the D.C. Anti-SLAPP Act's special-motion-to-dismiss provision, "discovery normally will not be allowed," *Fridman*, 229 A.3d at 512. Moreover, nothing in the Act provides substantive legal defenses to defendants or alters the elements plaintiffs must prove to prevail on their claims.

---

[25] *But see Gaudette v. Davis*, 160 A.3d 1190, 1199 (Me. 2017) (explaining that under the Maine anti-SLAPP statute, "the trial court must strictly limit the scope of . . . discovery"), *overruled in part on other grounds*, *Thurlow v. Nelson*, 263 A.3d 494, 502 (Me. 2021)).

In sum, the discovery-limiting aspects of the D.C. Anti-SLAPP Act's special-motion-to-dismiss procedure conflict with FRCP 56.[26] That means that the Anti-SLAPP Act's mandate that the Superior Court apply those discovery-limiting aspects of the Council-created procedure when a party invokes the protection of the Act — instead of applying the rules prescribed by (or adopted by the court pursuant to) Title 11 § 946 — violates the Home Rule Act.[27]

---

[26] By contrast, the Anti-SLAPP Act's attorney fee-shifting provision (§ 16-5504) addresses a matter not addressed by the Federal Rules, and thus does not conflict with the Federal Rules, with § 11-946, or with the Home Rule Act. *See Khan*, 292 A.3d at 260-61 ("[T]he fee-shifting provision of the Anti-SLAPP Act plainly does nothing to modify the procedure set forth in the Federal Rules of Civil Procedure for requesting and obtaining a statutorily authorized award of litigation costs.").

[27] To be clear, our analysis in this opinion governs when, as occurred in the instant case, the Superior Court considers materials outside the complaint when deciding an Anti-SLAPP Act special motion to dismiss (i.e., when in essence the court considers whether to grant summary judgment). We do not address in this opinion application of the Anti-SLAPP Act when the Superior Court resolves an Anti-SLAPP Act special motion to dismiss on the ground that the complaint failed to state a claim (i.e., when discovery is not an issue). *But see Am. Stud. Ass'n*, 259 A.3d at 750 ("A determination by the court pursuant to Rule 12(b)(6) that the responding party has failed to state a claim on which relief can be granted suffices to establish that the claim is not 'likely to succeed on the merits.' The court should rule on the special motion to dismiss with respect to each claim, even if it grants a 12(b)(6) motion to dismiss that claim."). We note that the Ninth Circuit, though declining to apply the discovery-limiting provisions of the California anti-SLAPP statute, has given effect to the California statute's attorney-fee-shifting provision where a defendant invoking the anti-SLAPP special-motion procedure contends that the complaint is deficient. *See Planned Parenthood*, 890 F.3d at 834 (agreeing that "[i]f a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a

Here, in seeking to persuade the Superior Court to allow them an opportunity for discovery, appellants filed declarations detailing the targeted discovery they sought. The Superior Court granted them answers to four interrogatories and a physical copy of a computer hard drive. But of the 148 witness-interview notes appellants requested, they were granted interview notes for only 18 individuals (excluding their own interview statements). In addition, while the Superior Court initially said it would allow appellants to take three depositions, the court subsequently sua sponte denied appellants an opportunity to take any depositions. Thus, while the Superior Court observed that appellants "received voluminous discovery under the limited discovery provision" of the Act, they received considerably less discovery than they sought.[28]

---

motion under Rule 12(b)(6) except that the attorney's fee provision of [the California anti-SLAPP statute] applies"); *see also* Sydney Buckley, Comment, *Getting SLAPP Happy: Why the U.S. District Court for the District of Kansas Should Adopt the Ninth Circuit's Approach when Applying the Kansas Anti-SLAPP Law*, 68 U. KAN. L. REV. 791, 821 (2020) (advocating application of the Ninth Circuit approach, such that the fee-shifting provisions of anti-SLAPP statutes would be applicable in federal courts in such circumstances).

[28] Sidley states that it produced roughly 31,000 pages of documents and former plaintiff Behnke's work hard drive. The APA answered four interrogatories, produced more than 22,000 pages of documents from the hard drive, and made 7,600 pages of Report exhibits publicly available. Appellants state that they received "very limited discovery."

Appellants seek a remand "for full discovery," arguing that "[d]efamation plaintiffs inevitably need substantial discovery from third parties about what defendants should have known, as well as from defendants themselves about [what] they knew," what they avoided learning, "and what documents they had when they published the challenged statements." Appellants emphasize that, in giving effect to the Act's special-motion-to-dismiss provision, the Superior Court "severely limit[ed] discovery in a case where evidence in [d]efendants' possession was critical to address issues of malice" and "a crucial step in demonstrating actual malice."[29] Appellants assert that they "cannot adequately rebut [the Report's] claims without access to" witness statements, interview notes, and other documents that appellees have withheld.

As we noted in the introductory pages of this opinion and as we discuss further *infra*, appellants dispute that they are public officials whose defamation claims are entirely subject to the actual-malice fault standard. It appears, however, that since appellants seek an award of punitive damages, the parties and their

---

[29] *See Standridge v. Ramey*, 733 A.2d 1197, 1203 (N.J. Super. Ct. App. Div. 1999) ("[T]here is an especially strong need for full discovery in a defamation action brought by a plaintiff who is classified as a 'public official.'").

discovery efforts must focus on the question of actual malice even if appellants are not public officials.[30] See *infra* note 38. We are persuaded that regardless of which standard applies — actual malice or negligence[31] — appellants were entitled to discovery under the Superior Court counterparts to the Federal Rules of Civil Procedure before the Superior Court ruled on what was in effect appellees' motion for summary judgment. But, giving effect to the Act's limited-discovery provision, the Superior Court denied appellants the opportunity for full discovery. We therefore reverse the judgment of dismissal and remand for further proceedings.

## 2. Appellants' Constitutional Claims

Appellants contend that the D.C. Anti-SLAPP Act is invalid on the additional ground that it unconstitutionally burdens their First Amendment right to petition the government to seek redress for harm to their reputations and

---

[30] Appellants acknowledged as much in their briefs filed in the Superior Court.

[31] For plaintiffs who are not public officials or public figures, establishing defamation requires proof of at least negligence on the defendant's part. *See Moss v. Stockard*, 580 A.2d 1011, 1022 n.23 (D.C. 1990) (explaining that this is so regardless of whether the source of the alleged defamatory statements is a media or non-media source).

livelihoods. In the context of this claim, too, appellants emphasize the Act's impairment of their right to discovery, an impediment they particularly decry since it applies even without proof that they filed suit with an abusive purpose. They complain that the possibility that they may be "saddled with the defendants' attorneys' fees" likewise burdens their right to petition.

We need not pause long over these claims. Because we have agreed that imposition of the discovery-limiting aspects of the Act's special-motion-to-dismiss procedure exceeded the Council's authority under the Home Rule Act and directly conflicts with § 946 of Title 11, and in light of our remand on that basis for full discovery, we need not address appellants' constitutional claim as it relates to the Act's severe limits on the opportunity for discovery to avoid pre-trial dismissal. In addition, our recent decision in *Khan* has already resolved any claim that the Act's attorney-fee-shifting provision, § 16-5504(a), unconstitutionally burdens the constitutional right to petition for redress of grievances. *See Khan*, 292 A.3d at 259 ("[W]e readily conclude that § 16-5504(a) imposes no undue burden on the First Amendment right to petition for redress of grievances.").[32]

---

[32] *See also id.* at 257-58 ("But even if a fee-shifting provision can be said to 'burden' the exercise of the right to petition by discouraging plaintiffs from asserting claims of questionable merit, that does not mean the burden is undue or so interferes with exercise of the right as to be unconstitutional. . . . [S]ome

Appellants also deride the Act's "reverse burden on the non-moving party." This is a reference to what we have called the Act's "reversal of the allocation of burdens . . . for summary judgment[.]" *Mann*, 150 A.3d at 1237. We cannot agree that the Act's burden-shifting provision infringes on appellants' constitutional right to petition. The Supreme Court has explained that "the right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see also McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("'[B]aseless litigation is not immunized by the First Amendment right to petition.'" (quoting *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983)). The burden-shifting provision imposes on SLAPP plaintiffs the burden of showing that the complaint rests on more than "unsupported claims that do not meet established legal standards," *Mann*, 150 A.3d at 1239, and of successfully rebutting any

---

encroachment on the right to petition – particularly when regulations do not directly impair the right to *access* the court – is permissible if it effectuates important interests of the government. . . . The Council unquestionably had significant reasons for enacting the Anti-SLAPP Act's fee-shifting provision . . . [including] [d]iscouraging the filing of meritless lawsuits, and . . . protecting the right to free speech guaranteed by the First Amendment . . . by shielding defendants from meritless litigation that might chill advocacy on issues of public interest." (internal quotation marks and citations omitted)); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 373 (7th Cir. 1987) ("[T]he proposition that the first amendment, or any other part of the Constitution, prohibits or even has anything to say about fee-shifting statutes in litigation seems too farfetched to require extended analysis." (footnote omitted)).

argument that the plaintiff "could not prevail as a matter of law, . . . after allowing for the weighing of evidence and permissible inferences by the jury," *id.* at 1236 (emphasis omitted). A plaintiff who is shut out of court because it cannot meet that burden has not been denied its constitutional right to petition the courts.

What remains of appellants' constitutional argument is the claim that the Act impermissibly burdens the First Amendment right to petition for redress by deterring plaintiffs whose lawsuits are not grounded on the types of abusive motives — the intent to punish or prevent expression — the Act was intended to stem. Appellants rely on cases from other jurisdictions in which courts have held that there must be a required showing of such an abusive motive if application of an anti-SLAPP statute is to pass constitutional muster. They contend that the Act's application to "well-founded suits to redress real harm . . . filed by individuals with limited resources against well-funded defendants [such as appellees here]" demonstrates its overbreadth. But here, as was the case in *Equilon Enterprises v. Consumer Cause, Inc.*, 52 P.3d 685 (Cal. 2002), appellants have "failed to identify any support for the proposition that the constitutionality of [the anti-SLAPP law] provisions depends upon their requiring proof of subjective intent." *Id.* at 692.

For the foregoing reasons, we reject appellants' constitutional claims.

\* \* \*

Appellants ask us to strike down the Act in its entirety. But in light of all the foregoing discussion, we see no basis for doing so in the absence of any argument by appellants that the discovery-limiting provisions of the Act are not severable. *See Hooks v. United States,* 191 A.3d 1141, 1145 (D.C. 2018) ("Even without a severability provision, there is always a presumption of severability whenever the remaining provisions, standing alone, are fully operative as a law." (internal quotation marks and citation omitted)). Our decision today precludes the Superior Court from giving effect to D.C. Code § 16-5502(c) (as well as the expedited-hearing sentence of § 16-5502(d) to the extent it would curtail discovery) unless and until the Superior Court rules are amended to authorize the discovery-limiting departure from the Federal Rules that the Act purported to mandate.[33] But, giving

---

[33] To state the point differently, § 16-5502(c) (as well as the expedited-hearing sentence of § 16-5502(d) to the extent it would curtail discovery) is to be disregarded unless and until there are such rule amendments. *Cf. Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2350 (2020) ("[I]f any part of an Act is unconstitutional, the provisions of that part may be disregarded while full effect will be given to such as are not repugnant to the constitution of the United

deference to the Council's legislative intent[34] (and authority) to create substantive rights for SLAPP defendants, including "financial levies to deter a SLAPP plaintiff," *Mann*, 150 A.3d at 1238, we decline to strike the Act's attorney-fee-shifting provision (§ 16-5504(a)), and we likewise decline to strike § 16-5502(a) or § 16-5502(b) (including its burden-shifting provision).[35]

## B. The "Public Official" Issue

"To succeed on a claim for defamation, a plaintiff must prove: '(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that

---

States." (internal quotation marks omitted)). Our holding is that § 16-5502(c) (as well as § 16-5502(d) to the extent it would curtail discovery) is "inoperative or unenforceable" until such time as any that the Superior Court rules are amended to adopt the provisions' discovery limitations, "but not void in the sense [of being] repealed or abolished." *Jawish v. Morlet*, 86 A.2d 96, 97 (D.C. 1952).

[34] *See Woodroof*, 147 A.3d at 787.

[35] As the First Circuit has observed, "[n]either Fed. R. Civ. P. 12(b)(6) nor Fed. R. Civ. P. 56 determines which party bears the burden of proof on a state-law created cause of action." *Godin*, 629 F.3d at 89. Moreover, "the burden of proof [is] a 'substantive' aspect of a claim[,]" *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20-21 (2000), and we thus regard the Council's allocation of the burden of proof to SLAPP plaintiffs as a substantive enactment that does not implicate the Federal Rules. *See also Godin*, 629 F.3d at 89 (["[I]t is long settled that the allocation of burden of proof is substantive in nature and controlled by state law.") (citing *Palmer v. Hoffman*, 318 U.S. 109, 117 (1943)).

the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Mann*, 150 A.3d at 1240 (brackets and footnote omitted) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)). As to the third element, the requisite showing of fault depends on whether the plaintiff is a public official[36] or public figure,[37] both of whom are subject to the heightened proof requirement of actual malice, or is instead a private individual, who need prove only negligence.[38] *Id.* at 1240 n.33. To establish

---

[36] We note, with reference to appellants' status as now-retired military officers, that "[e]ven though a person is no longer publicly employed, . . . he or she will ordinarily be treated as a public official with respect to comments about his or her past performance in that role." 1 ROBERT D. SACK, SACK ON DEFAMATION § 5:2.1, at 5-9 (5th ed. 2017) (hereafter, "SACK") (citing cases); *see Rosenblatt v. Baer*, 383 U.S. 75, 87 n.14 (1966) (acknowledging that "there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the [rule in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)]").

[37] See *supra* note 31. Appellees do not contend (or no longer contend) in this case that appellants are limited-purpose public figures.

[38] However, a private plaintiff seeking punitive damages for alleged defamation must prove actual malice to recover such damages, at least when the defamatory statements involve matters of public concern. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348-50 (1974) (acknowledging that there is a "strong and legitimate state interest in compensating private individuals for injury to reputation," but holding "that the States may not permit recovery of presumed or

actual malice, a plaintiff must show "that the defendant either (1) had 'subjective knowledge of the statement's falsity,' or (2) acted with 'reckless disregard for whether or not the statement was false.'" *Id.* at 1252 (quoting *Doe No. 1 v. Burke*, 91 A.3d 1031, 1044 (D.C. 2014)); *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).[39]  "[W]here the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed in the same manner." *Close It! Title Servs.*, 248 A.3d at 140 (quoting *Blodgett v. Univ. Club*,

---

punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth"; "the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury"); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985) ("We conclude that permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern."); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 90 (D.C. 1980) (affirming grant of summary judgment against plaintiff on a claim for presumed or punitive damages because plaintiff had failed to produce evidence of defendant's "knowing or reckless false publication" under the "constitutionally mandated *Times* malice standard); *Davis v. Schuchat*, 510 F.2d 731, 737 n.5 (D.C. Cir. 1975) (applying the foregoing statement in *Gertz* in the case of a non-media defendant).

[39] The *New York Times* actual malice standard is sometimes called "constitutional actual malice" to distinguish it from "actual malice in the common-law sense of spite or ill will." *See* SACK, § 1:3.1 at 1-34; *Moss*, 580 A.2d at 1026 n.29. *But see Harte-Hanks Commnc'ns v. Connaughton*, 491 U.S. 657, 668 (1989) (noting that "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry" and explaining that evidence of motive can be "supportive" of a conclusion about reckless disregard as to truth or falsity of allegations).

930 A.2d 210, 222-23 (D.C. 2007)).  "[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion."  *Klayman v. Segal*, 783 A.2d 607, 619 (D.C. 2001) (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994)).

Appellants argue that the Superior Court erred in determining that they were public officials and in scrutinizing their evidence and likelihood of prevailing with an actual-malice lens.  In their complaint and accompanying affidavits, appellants characterize themselves as "mid-level employee[s]" who were not in a position to formulate DoD or military policy.  They contend that their role was to execute the policy directives of their superiors and emphasize that they did not have authority to speak on behalf of DoD.  The Superior Court reasoned that the Report "clearly addresses [appellants'] performance of their official duties," but appellants assert that they did their work on the PENS Task Force during their free time as volunteers and private individuals who were members of the APA's military psychologists division, not in their capacity as military officers.  In asserting in their special motions to dismiss that appellants are public officials, appellees relied

in large part on appellants' ranks and titles[40] as well as on excerpts from appellants' descriptions (in the complaint) of their positions and responsibilities.

The Supreme Court has not precisely defined the term "public official," and the case law reflects difficult-to-reconcile determinations about particular public employees who have been determined to be, or not to be, public officials. *See generally* SACK, § 5:2.1 at 5-7 and 5-10 to 5-20 (collecting cases). The term "eludes precise definition." *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 202 (1st Cir. 2006). The Supreme Court has instructed, however, that not every public employee is a public official for libel-law purposes. *See Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979). The term "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85. But "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in

---

[40] Appellant Banks was Director of Psychological Applications for the United States Army's Special Operations Command. Appellant James was the Chief of the Department of Psychology at Walter Reed Army Medical Center and Tripler Army Medical Center, and Director of Behavioral Science at Guantanamo and Iraq. Appellant Dunivin was Chief of the Departments of Psychology at Walter Reed Medical Center and Walter Reed National Military Medical Center.

controversy." *Id.* at 86 n.13.[41] A public-official position is one with "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees[.]" *Id.* at 86.[42]

This court's case law establishes that a government employee's position may be of "apparent importance" by virtue of, for example, control over policy, direct interaction with the public, or supervisory authority over other employees. *Beeton v. District of Columbia*, 779 A.2d 918, 921, 924 (D.C. 2001) (corrections officer was public official); *Thompson v. Armstrong*, 134 A.3d 305, 308, 312 (D.C. 2016) (special agent with Treasury Inspector General was public official). In considering

---

[41] *See also Moss*, 580 A.2d at 1029 ("[T]he *position* occupied by the official must be distinguished from the controversy in which he has become embroiled, for it is the former that must inherently invite public scrutiny."); *O'Connor v. Burningham*, 165 P.3d 1214, 1220 (Utah 2007) ("Public officials owe their status to the duties demanded by their official positions, not to the vagaries of events that may occur while they occupy these positions.").

[42] "Law enforcement officers at virtually every level have been held to be public officials," SACK, § 5:2.1 at 5-12 (footnote omitted), a result that seems to follow from their wielding substantial and direct authority in enforcing the law against the public. The Sack treatise suggests that all elected officials are public because "they place their character and behavior before the public for consideration" by running for office, while "[o]nly some nonelected officials are subject to the [actual-malice] standard." *Id.* at 5-8 (citing *Garrison v. Louisiana*, 379 U.S. 64 (1964)).

a plaintiff's public-official status, we have echoed the Supreme Court's reasoning that "public officials, with superior access to the media, usually are better able than ordinary individuals to affect the outcome of those issues and to counteract the effects of negative publicity." *Moss*, 580 A.2d at 1029 (citing *Rosenblatt*, 383 U.S. at 85-86); *see also Gertz*, 418 U.S. at 344 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."). *See generally* 1 RODNEY A. SMOLLA, LAW OF DEFAMATION § 2:108 (2d ed. 2023) ("[C]ourts have begun to emphasize the degree of policy-making authority wielded by the plaintiff in his or her official position, as well as the plaintiff's level of access to the media, as factors to be weighed in making the public official determination.").

In determining that appellants are public officials, the Superior Court relied in part on appellants' positions, which it found "comfortably fit within the hierarchy of public officials as provided in *Rosenblatt*." The court also relied on appellants' allegations in the complaint that they drafted, created, implemented, and helped put in place policies, procedures, and training relating to interrogations and interview techniques; investigated interrogation abuses; and, in the case of appellant Banks, provided technical oversight of Army Special Operations

psychologists and became an author of an Army Inspector General Report on detainee operations. The court did not give explicit consideration to appellants' access *vel non* to the media. Appellants contend that this was error and argue that appellees failed to present evidence that would have supported a legal determination that each of the appellants is a public official.

Appellants argue in particular that the issue of their status as public officials is one that appellees raised as an affirmative defense and for which appellees accordingly bore — but failed to meet — the burden of proof. They cite the precedent of courts in California,[43] which have held that when an anti-SLAPP defendant asserts, in an anti-SLAPP special motion to dismiss, the affirmative defense of conditional privilege — which includes the defense that an alleged defamatory statement concerned a public official and thus is protected unless made

---

[43] The California anti-SLAPP statute was on the Council's radar when it enacted the D.C. Anti-SLAPP Act, *see* Report on Bill 18-893 at 3, and California "has a well-developed body of anti-SLAPP jurisprudence." *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 255 (D.D.C. 2013). However, this court does not invariably hew to the precedent of other jurisdictions, including California, in interpreting their anti-SLAPP statutes. *See Saudi Am. Pub. Rels. Affs. Comm.*, 242 A.3d at 611 (declining to "selectively follow other state court decisions" in interpreting the D.C. Anti-SLAPP Act).

with actual malice[44] — the *defendant* bears the initial burden of proof of establishing the facts necessary to support that affirmative defense.[45]  However, this court explained in *Mann* that "[t]he standards against which the court must assess the legal sufficiency of the [plaintiff's] evidence [in addressing a D.C. Anti-SLAPP Act special motion to dismiss] are the substantive evidentiary standards that apply to the underlying claim *and related defenses and privileges*."  150 A.3d at 1236 (emphasis added).  That statement seems to envision that under the D.C. Anti-SLAPP Act, it was appellants who bore the burden of coming forward with evidence to support a determination that they are not public officials.  We think an interpretation that assigns this burden to defamation plaintiffs, like appellants, even as to defendants' asserted affirmative defense is necessary to give meaning to the

---

[44] *See N.Y. Times*, 376 U.S. at 298 (Goldberg, J., concurring) (stating that the Constitution affords "a 'conditional privilege' immunizing nonmalicious misstatements of fact regarding the official conduct of a government officer").

[45] *See, e.g.*, *Davis v. Elec. Arts, Inc.*, 775 F.3d 1172, 1177 (9th Cir. 2015) (citing *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 44 676 (Ct. App. 2005) (explaining that although the California anti-SLAPP statute "places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense")); *see also Bently Reserve LP v. Papaliolios*, 160 Cal. Rptr. 3d 423, 435 (Ct. App. 2013) ("When evaluating an affirmative defense in connection with . . . an anti-SLAPP motion, the court . . . should consider whether the defendant's evidence in support of an affirmative defense is sufficient, and if so, whether the plaintiff has introduced contrary evidence, which, if accepted, would negate the defense.").

Act's burden-shifting provision; after all, in the summary judgment context even outside the context of an Anti-SLAPP Act motion, a non-moving party (here, appellants) *always* has the burden of "mak[ing] a sufficient showing on an essential element of [its own] case with respect to which [it will bear the burden of proof at trial]."[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also id.* at 325 (rejecting the notion "that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof"). But even if the quoted language from *Mann* means no more than that the burden is on appellants to demonstrate that appellees cannot shoulder *their* burden of proving their claims that appellants are public officials, appellants still must bear some of the burden on this issue.

And, in any event, as regards questions of law such as whether a defamation plaintiff is a public official, *see Thompson*, 134 A.3d at 312, "burdens of proof have no place," *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 983 & n.5 (C.D. Cal. 1999) (explaining that "[b]urdens are relevant when evidence is

---

[46] In a defamation case such as this one, the essential elements to be proven include that the allegedly defamatory statement was made "without privilege." *Mann*, 150 A.3d at 1240.

ambiguous or evenly balanced," but that "the issue of who bears the 'burden of proof' . . . cannot affect the legal question"). *See Marinelarena v. Barr*, 930 F.3d 1039, 1049 (9th Cir. 2019) ("[A] pure question of law . . . is unaffected by statutory burdens of proof.").

We conclude that we should remand the issue of appellants' public-official status for the Superior Court to make the determination in the first instance, based on applying all of the relevant considerations and on a more fully developed record. Appellants emphasized at oral argument that some facts bearing on their status as public officials *vel non* is not in the record. They also suggest that the truth or falsity of some of the Report's content (such as insinuations that appellants' "private deliberations about APA policies . . . had [an] effect on governmental policies") is relevant to resolution of the public-official issue.

Further, the present record affords us no insight into matters such as whether appellants' policy-drafting efforts were types of tasks inherent in their roles as military officers, or whether they were assigned or undertook their efforts, alleged in the complaint or discussed in the Report, based on their "particular proclivities." *Mandel*, 456 F.3d at 205-06 (explaining how "the factual record, at the summary judgment stage, was too uncertain to warrant a legal conclusion either way" about

the public-official status of the plaintiff assistant state's attorney). No discovery was conducted to assist in resolution of whether any or all of the appellants had "substantial responsibility for or control over the conduct of governmental affairs" by virtue of their positions (or whether, as they assert, they merely "executed the policy decisions of their superiors"); or whether appellants had access to the media to defend their reputations.[47] We have not overlooked that appellants' request for discovery does not appear to have been directed at obtaining information relevant to the public-official issue, but we are also mindful that appellants were describing the *targeted* discovery they wanted the court to permit, and they understandably focused on materials they thought would enable them to prove actual malice.

We acknowledge that an early resolution of the public-official issue is preferable so that the parties "will know what case they are preparing and may be expected to try" and to enable them to avoid "unnecessary time, effort, and expense of preparing two cases." SACK, § 5:4.2 at 5-84 (advocating for resolution of the public-figure issue "at the earliest opportunity that the state of the record

---

[47] To be sure, the record does contain some relevant evidence on this point. It discloses that in 2008, appellant James published a memoir (*Fixing Hell: An Army Psychologist Confronts Abu Ghraib*) that discussed the work of the PENS Task Force. This may have some bearing on the access-to-the-media issue, at least as to appellant James. This underscores, too, that the conclusion as to public-official status may not be the same for each of the appellants.

will permit"); *see also Miller v. Transam. Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980) (advising that the question of public-figure status should "be answered as soon as possible"). "It does not follow, however, that the issue should always be decided as a preliminary matter," because "[t]here are cases in which the pretrial record is simply inadequate for proper determination of the issue." SACK, § 5:4.2 at 5-84; *see also Mandel*, 456 F.3d at 204 ("[T]here are cases in which it may not be possible to resolve the [public-official or public-figure] issue until trial." (internal quotation marks and citation omitted)). We think this is such a case.

In sum, as to the public-official issue, we conclude, again, that appellants were entitled to discovery in an effort to meet their evidentiary burden to show a likelihood of prevailing against appellees' asserted defenses and privileges. We therefore decline to resolve the issue of their public-official status in this appeal. Instead, "we authorize the . . . [p]arties, if they wish, to seek further consideration of [the public-official] issue on remand." *Saudi Am. Pub. Rels. Affairs Comm.*, 242 A.3d at 612 n.13.

## C. Republication

Appellants' republication claim (Count 11 of the Supplemental Complaint) alleges that on August 21, 2018, the APA's General Counsel sent an email to the APA Council of Representatives listserv, which includes persons who are not APA Council members, containing a link to an online APA Timeline page that in turn contains a link to the Report (as well as over 170 links to other documents, including some documents critical of the Report).  Appellants assert that the email "constituted a separate communication of the defamatory Report to both the same persons and new persons"[48] and, along with some changes the APA made to its website, constituted a republication by all of the appellees (including Sidley and Hoffman, based on the claimed "foreseeab[ility]" of the putative republication).

---

[48] Appellants point to statements in two affidavits averring that as a result of the email, the Report reached some "new and different readers."  See Affidavit of Sally Harvey in Support of Plaintiffs' Memorandum in Opposition to Defendants' Second Set of Special Motion to Dismiss Under D.C. Anti-SLAPP Act, ¶ 6 ("Because the email announcement of the republished Report was posted to the Council listserv, which included recipients who are not Council members as well as Council members who were different from those Council members receiving the Report in 2015, the Report reached new and different readers."); Affidavit of Russell Newman in Support of Plaintiffs' Memorandum in Opposition to Defendant's Second Set of Special Motion to Dismiss Under D.C. Anti-SLAPP Act (same averment).

The Superior Court concluded as a matter of law that there was no republication on August 21, 2018.[49] The court relied on the record evidence that the APA General Counsel's email did not contain a direct link to the Report[50] Further, the court reasoned that "there is no evidence that Defendant APA intended

---

[49] The Superior Court summarized the relevant law as follows:

> Whether the publisher of a defamatory statement may be liable for republication depends on whether the publisher "edits and retransmits the defamatory material or redistributes the material with the goal of reaching a new audience." *See Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 880 (W.D. Va. 2016) (internal citations omitted). "In the context of internet articles . . . courts have held that 'a statement on a website is not republished unless the statement itself is *substantively altered or added to*, or the website is directed to a new audience.'" *Id*. (internal citations omitted) (emphasis added). Thus, the relevant inquiry focuses on whether there has been a change in the content of the defamatory statement or whether the publisher actively sought a new audience.

March 12, 2020, Order at 11.

[50] The court's emphasis on the use of a hyperlink was consistent with the holdings of other courts regarding the posting of hyperlinks. *See, e.g.*, *Lokhova v. Halper*, 995 F.3d 134, 142 (4th Cir. 2021) (quoting the district court's observation that "although creating hypertext links to previously published statements may technically direct audiences' attention to the prior dissemination of those statements, such links do not constitute republication." (internal quotation marks and citation omitted)); *id.* at 143 (noting that "courts have consistently agreed that '[m]erely linking to an article should not amount to republication'"); *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) ("[T]hough a link and reference may bring readers' attention to the existence of an article, they do not republish the article").

to, or actually did, reach a new audience" and remarked that appellants' contention that the APA sought a new audience by sending the email "exaggerates the available evidence."

This court — which, at least for statute-of-limitations purposes, has adopted the so-called "'single publication' rule," i.e., the rule that "a book, magazine, or newspaper has one publication date, the date on which it is first generally available to the public," *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 n.2 (D.C. 2001) — has not previously decided whether defamatory material is republished when a hyperlink directing the reader to it is posted on a website. We decline to decide the issue on the present record. We conclude that, just as with respect to the actual-malice and public-official issues, the republication issue is one as to which appellants should be given an opportunity for discovery. The Superior Court's remarks — about there being "no evidence that [d]efendant APA intended to, or actually did, reach a new audience" and about appellants' "exaggerat[ion of] the available evidence" — raise the question whether the available evidence on these points might be expanded through discovery.[51] We also think it possible that a

---

[51] Regarding whether the General Counsel's email actually might have reached new readers, it does seem clear that appellants' affiants were not themselves part of any new audience because the record indicates that they were well aware of the 2015 publication before 2018: the record shows that affiant

more fully developed record could illuminate factors that conceivably would affect our decision whether to recognize republication, for example, whether a website is managed statically or dynamically, the context of a particular hyperlink, and the degree of removal (if any) of the hyperlink from the defamatory content (i.e., whether and how many additional steps are necessary to reach the defamatory content from the hyperlink in question).

### III.   Conclusion

For the reasons discussed above, we reverse the judgment of the Superior Court dismissing appellants' complaint and remand for further proceedings consistent with this opinion.

*So ordered.*

---

Harvey (see *supra* note 48) led a "careful examination" of the Report and "provided a detailed response" in November 2015, and affiant Newman was a plaintiff in the case when it was filed in 2017.